232 So.2d 296

**Marshall HOPPER**

v.

**Ralph BILLS and Jenny Bills d/b/a Jenny & Shorty's.**

**No. 49872.**

Feb. 23, 1970.

Patsy Jo McDowell, Baton Rouge, for appellant.

1. The truck and trailer are described as follows:
    1. Ford .F 600 chassis and cab—year 1963—identification number F 60 DK 431466.

Brown & McKernan, J. J. McKernan, Baton Rouge, for appellees.

HAMLIN, Justice.

Plaintiff brought this action for damages and attorney's fees resulting from the alleged illegal seizure and wrongful detention of his logging truck and trailer.[1] The trial court rejected plaintiff's demands; on oral motion of the defendant Ralph Bills, his third party demand against the Department of Public Safety was dismissed with prejudice. The Court of Appeal affirmed the judgment of the trial court. 220 So.2d 769. We granted certiorari for review of the matter. Art. VII, Sec. 11, La.Const. of 1921; 254 La. 281, 223 So.2d 408.

The Court of Appeal has correctly stated in substance the facts of the case as follows:

"The defendant-appellees, Ralph and Jenny Bills, are the owners and operators of a truck stop and cafe and also operate a wrecker service, under the name of Jenny and Shorty's. On November 19, 1966, the desk sergeant on duty at Troop 'A' Headquarters, Louisiana State Police, called the defendant-appellees and requested that they send a wrecker to re-

2. Frost—Pole Tandem—year 1959— serial number RNT 2073.

move an overturned log truck. The logging truck in question belonged to the plaintiff, Marshall Hopper, and had overturned off of the shoulder of the highway when the driver thereof swerved to miss another vehicle. The overturned truck was located anywhere from four to thirteen feet from the blacktop portion of the highway and was approximately three miles south of the East Feliciana Parish line of the Parish of East Baton Rouge.

"Upon arrival at the scene of the overturned truck, it was necessary that the defendant request the aid of a larger wrecker so that the overturned vehicle could be righted in order that it be removed from the scene.[2] From the scene of the accident it was hauled to the defendant's truck stop. On approximately December 1, 1966, plaintiff-appellant made inquiries of Mr. Bills relative to the release of his logging truck.[3] Mr. Bills informed the plaintiff that he would be happy to release the truck upon payment of the towing charges plus any storage charges which had accrued to that date. (The towing charge was $80.00; a dollar a day was charged for storage) On January

2. Carlton D. Smith, engaged in wrecker service in East Baton Rouge Parish, testified that he worked a wreck with Ralph Bills (he did not remember whether the date was November 19, 1969). He stated that he called the State Police and inquired whether he was supposed to go ahead and assist Bills; the response was to the effect that if Bills had called, he should go help him. Smith testified: "Well, both, we both turned it up; both wreckers turned it up and then I pulled it on out of the ditch and Ralph pulled it on in with his truck." He said that it was necessary to have both wreckers pull the truck over out of the ditch, and that he was paid $35.00 by Bills for his services.

3. Marshall Hopper testified:
   "Q. What was the first that you found out where the truck was?
   "A. Well, I went to Zachary to get a starter for a truck while this truck had gone to unload, and as I was coming from Zachary, when I got back to the Zachary crossroad, I saw Shorty's wrecker go up the road. And after the truck had been moved, well, on a Monday or a Tuesday after this wreck happened, which this happened on a Saturday—

three or four days later I rode down here to Shorty's Wrecker Service 'cause one of J. B. Brunt's drivers told me he thought he saw one of my trucks down there. They haul lumber all down through New Orleans and everywhere. So I drove down three or four days later after it turned over and it was at the new place over here, behind his place.
   "Q. Here in Ascension Parish?
   "A. Yes, ma'm.
   "Q. At Jenny's and Shorty's?
   "A. Yes, ma'm.
   "Q. Did you go in at that time and speak to him about it?
   "A. No, ma'm.
   "Q. What steps did you take to see about getting it, Mr. Hopper?
   "A. I went back to Clinton and I talked to Mr. Art Doty. This was on about December 3 or 4."
   After talking with Art Doty, Sheriff of East Feliciana Parish, calls were made to the State Police and Shorty's Wrecker Service. Hopper was apprised that his truck would not be released until he paid the assessed charges; he did nothing towards securing the release until January 4, 1967 when he secured a writ of sequestration.

4, 1967, the plaintiff caused a Writ of Judicial Sequestration to be issued in conjunction with the instant proceeding, and under the writ was made custodian of the vehicle. \* \* \* "

By amended and supplemental petition, filed January 9, 1967, Hopper alleged that he believed that there was an illegal arrangement and conspiracy between the said Ralph Bills and someone in the State Police Department whose name he did not know at the time; he further alleged that his damages were caused by the intentional, willful and malicious acts of Ralph Bills and Jenny Bills, d/b/a Jenny & Shorty's. He prayed for damages in the sum of $27,525.00 and attorney's fees in the sum of $1,000.00.

In affirming the judgment of the trial court, the Court of Appeal found that defendants had a lien on plaintiff's car for their expenses, and that no unlawful conversion or detention had been committed. It stated:

"Mr. Bills, the defendant, had in his possession the property of another, Mr. Hopper, the plaintiff. The defendant did incur expense for the preservation of this logging truck, i. e., wrecker service and storage. The defendant had the right to retain possession of the logging truck until the expenses were repaid. See In re Parking Service, Inc., 232 La. 133, 94 So. 2d 7 (1957). Therefore, since the Louisiana Civil Code granted the defendants the right to retain the truck until their expenses were repaid, there can be no unlawful detention or conversion on their part."

In this Court, the plaintiff assigns the following errors to the judgment of the Court of Appeal:

1. The Court of Appeal was in legal error in holding that Louisiana Civil Code, Articles 3224 and 3225 give a wreckerman a lien against a vehicle which he has removed from the highway right-of-way.

2. The Court of Appeal was in legal error in holding that no conversion is committed when a wreckerman who had no legal authority but only an apparent authority in removing a vehicle from the highway right-of-way, and refuses to return the vehicle to the rightful owner when demand is made on him has a right to do so.

3. The Court of Appeal was in legal error in holding that the "custom" of the State Police to have vehicles removed from the highway right-of-way gives them "apparent legal authority" to remove same.

The evidence of record discloses that plaintiff's truck—turned upside down in the ditch—was a source of curiosity for passing motorists. There was a slowing down of traffic and somewhat of a congestion of cars.

The evidence of record reflects that a desk sergeant at the State Police Office telephoned Ralph Bills and requested that he remove the truck from the ditch. This officer made a judgment that the overturned vehicle should be removed. The day was Saturday, and the time was afternoon; it is a known fact that motorists travel on weekends, and traffic is heavy.

LSA–R.S. 32:2 empowers the Department of Highways, as an exercise of the police power of the State, to supervise and regulate all traffic on all highways within the State of Louisiana; it is also empowered to effect methods and practices "as in its judgment and experience" it deems advisable. LSA–R.S. 32:3 recites: "The department of public safety shall enforce the provisions of this Chapter and the department's regulations adopted pursuant thereto on all highways of this state within its jurisdiction and shall exercise such other power and authority as is specifically set forth in this Chapter or other laws of this state." LSA–R.S. 32:5 provides that: "All law enforcement officers of this state or any political subdivision thereof invested by law with authority to direct, control or regulate traffic are authorized to enforce the provisions of this Chapter and regulations of the department and director of public safety adopted pursuant hereto, within their respective territorial jurisdictions."

Thomas D. Burbank, Director of the Department of Public Safety and in charge of the State Police in Louisiana, testified:

"Q. General Burbank, by what authority would a state police trooper or state policeman in any capacity call any wrecker service where an automobile, truck or vehicle is off the highway right-of-way and not interfering with traffic?

"A. It's been a policy of the department for many years whenever a vehicle of any type was either on the highway proper or on the shoulder of the highway that would cause vehicular traffic to stop which would impair the normal flow of traffic, that we would remove such vehicle from the right-of-way of the highway or from the shoulder of the road itself."

We find that the Louisiana trooper, exercising the police power of the State and acting under the above statutes, did not abuse his discretion in making a judgment to have plaintiff's vehicle removed from the ditch and towed away. The Department of Public Safety is not a party to this suit, and we are not informed of the reason for not calling plaintiff at the time the accident was investigated. However, the evidence does disclose that there were no license plates on the vehicle; the State Trooper who investigated the accident stated in his report that a license plate was

applied for.[4]  Under such facts and circumstances, the State Trooper acted with immediate speed in order to eliminate what he thought was a public hazard.  We do not find that custom gave the trooper his authority, although the Director of the Department of Public Safety, supra, stated that the officer's action was customary; we find that the trooper's action stemmed from a discretion vested in him by law.

■ Having found that plaintiff's truck and trailer were not illegally seized, we approach the questions of whether defendants committed an illegal conversion or an unlawful detention in refusing to surrender plaintiff's vehicle to him without payment of charges and whether plaintiff suffered recoverable damages from their actions.

"Conversion is a tort, a wrongful act, which in the nature of things cannot spring from the exercise of a legal right.  The law of conversion, it has been said, is concerned with possession, not title, conversion being an offense against possession of property.  It may be either direct or constructive, and may be proved directly or by inference.  The essence of conversion is not the acquisition of property by the wrongdoer, but a wrongful deprivation of it to the owner, although a temporary deprivation will be sufficient; and in consequence it is of no importance what subsequent application was made of the converted property, or that defendant derived no benefit from his act.

"In order to constitute a conversion there must be either some repudiation of the owner's right, or some exercise of dominion over it inconsistent with such right, or some act done which has the

---

4.  Plaintiff testified as follows:
"Q.  Well, there were no license tags on the truck at the time of the accident, were there?
"A.  There wasn't no license plates on the truck at the time of the accident.
"Q.  There were no license plates on the truck.
"A.  No, sir.
"Q.  And your trucks have no markings, do they?
"A.  Have no what?
"Q.  Markings as to who they belong to.
"A.  Well, I don't know whether this truck had—I bought all those trucks from J. B. Brunt Lumber Company and the title wasn't changed on those trucks for a good while.  In fact, this year I bought tags the first of the year and then again in May.

"Q.  All right, sir.  To get back to my other question, the truck involved in the accident had nothing on it, painted on it or anything, which would indicate that it was owned by you, did it, sir?
"A.  Nothing but it should have a sticker on the windshield.  I don't know whether they put that on it or not.
"Q.  You don't know whether the sticker was on the windshield.
"A.  Certainly there was.
"Q.  What kind of sticker are you referring to?
"A.  Safety sticker that the State of Louisiana requires on all cars, trucks—
"Q.  So this was the only identifying emblem on the truck, was a safety sticker, is that correct?
"A.  That's all I can think of right now."

effect of destroying or changing its character, or, as otherwise expressed, there must be a wrongful taking or a wrongful detention, or an illegal assumption of ownership, or an illegal user or misuser. * * *" 89 C.J.S. Trover & Conversion § 3, pp. 533, 534.

"Acts which would otherwise constitute a conversion may be considered not to be a conversion, where they are done by authority of law, by direction or order of a court, or by authority of valid process. * * *" 18 Am.Jur.2d, Sec. 77, p. 206.

"Not every failure to deliver upon demand, however, will constitute a conversion. * * * And even when he has possession, a qualified refusal, for a reasonable purpose and for a reasonable length of time, is not a conversion. The defendant may detain the goods for a reasonable time to identify the plaintiff, to determine his right to possession, to ascertain whether charges against the goods are correct, or if he is an agent, to consult the principal from whom he received them. All such detentions must, however, be made in good faith, with the reason stated. * * *" William L. Prosser, Law of Torts, Conversion, Sec. 15, p. 91.

Despite his allegations, plaintiff offered no proof of any conspiracy existing between defendants and the Department of Public Safety. He offered no proof that defendants did not act upon orders; he merely offered some proof that he might have been able to remove his vehicle from the ditch without professional assistance. He permitted his vehicle, as stated supra, to remain at the defendants' storage facilities until January 4, 1967 despite the fact that he knew of its location a few days subsequent to the accident of November 19, 1966.

We find from the record that the defendants acted in good faith; they acted under a valid process. Their refusal to surrender plaintiff's vehicle was qualified; under our findings supra, they were entitled to their charges, and until such were paid, they were entitled to retain possession of plaintiff's truck and trailer. They did not wrongfully deprive plaintiff of his vehicle; defendants committed no illegal conversion or unlawful detention by their actions of refusing plaintiff possession of his vehicle under the conditions of his demand. Cf. Importsales, Inc. v. Lindeman, 231 La. 663, 92 So.2d 574; Brian v. Wilson, La.App., 81 So.2d 145; Kaplan v. Associates Discount Corporation, La.App., 206 So.2d 537; 253 La. 137, 217 So.2d 177; Oge v. Resolute Insurance Company, La.App., 217 So.2d 738.

Having found that defendants were legally entitled to their towage and storage charges, we conclude that they had a right upon the plaintiff's vehicle for the payment of such.

"He who, having in his possession the property of another, whether in deposit or on loan or otherwise, has been obliged to incur any expense for its preservation, acquires on this property two species of rights." West's LSA-R.C.C. Art. 3224.

"Against the owner of the thing, his right is in the nature of that of pledge, by virtue of which he may retain the thing until the expenses, which he has incurred, are repaid.

"He possesses this qualified right of pledge, even against the creditors of the owner, if they seek to have the thing sold. He may refuse to restore it, unless they either refund his advance, or give him security that the thing shall fetch a sufficient price for that purpose." West's LSA-R.C.C. Art. 3225.

"Any person operating a garage or other place where automobiles or other machinery are repaired, or parts therefor are made or furnished, has a privilege upon the automobile or other machinery for the cost of repairs made, parts made or furnished, and labor performed. This privilege is effective for a period of ninety days from the last day on which the repairs were made, or parts made or furnished, or the labor performed. For the purposes of this section, it is immaterial where the automobile or other machinery may have been located at the time or by whom the parts may have been attached.

"This privilege may be enforced by the writ of sequestration, without the repairman having to furnish security therefor. This privilege has no effect against a vendor's privilege, a chattel mortgage previously recorded, or against a bona fide purchaser to whom possession has been delivered and who has paid the purchase price without previous notice of the existence of the privilege." LSA-R.S. 9:4501.

In view of our findings supra, the above statute, and articles of the Revised Civil Code, plaintiff is not entitled to recover damages from the defendants. See, In Re Parking Service, 232 La. 133, 94 So.2d 7; Andress Motor Co., Inc. v. Butler, La.App., 43 So.2d 913; Mahfouz v. Yawn, La.App., 31 So.2d 295.

For the reasons assigned, the judgment of the Court of Appeal, First Circuit, is affirmed. All costs to be paid by plaintiff.

HAMITER, J., concurs in the result.

BARHAM, Justice (dissenting).

I find no statutory law or regulation of the Department of Public Safety under which a state trooper may authorize the towing away and impounding of a vehicle "located anywhere from four to thirteen feet from the blacktop portion of the highway". The majority, which has also apparently failed to find regulatory authority

for the removal of such vehicles, has concluded " * * * that the trooper's action stemmed from a discretion vested in him by law", but cites no specific statute which vests such discretion in the state police.

I must also disagree with the majority's holding that the Louisiana trooper was "exercising the police power of the State". Only the Legislature of a state can exercise "the police power of the State", and the "power" of an individual policeman is not to be equated with that sovereign right. Neither the discretion to exercise police power nor the power itself—that is, to make police regulations—can be delegated or bargained away to the caprice of individual employees of the state.

Many jurisdictions provide by law or regulation for the removal of vehicles from highway rights of way where their presence threatens the safety and welfare of others, and undoubtedly a state law or regulation of this nature would serve a useful purpose. Such law or regulation could provide the factors determinative of a decision to remove, the method and procedure of re-

moval, and the place of impoundment, and could require payment by the owner of the cost of the vehicle's removal and storage. Our state, however, has no such law or regulation, and a police officer is not and cannot be delegated the authority to determine or guess at what is violative of the law or to establish measures necessary for public safety. The police officer is obligated to act under and within the law and is not endowed with law-making power. He is not a public official vested with broad discretionary powers. To the contrary, his responsibilities are narrowly defined in order to protect the public from the possible abuse of discretionary exercise of power.*

I must conclude that the state trooper was without authority to have the plaintiff's vehicle removed and stored. The defendants' refusal to surrender plaintiff's vehicle to him when they held it without authority of law or order of court or any other valid authority constituted a conversion for which the plaintiff is entitled to relief.

I respectfully dissent.

---

* The instant case presents an excellent example of the abuse which can result from the exercise of police discretion totally uncontrolled by law or regulation. The trooper here did not engage the most convenient, the nearest, or the cheapest wrecker service to tow away the vehicle, and in fact the vehicle was towed past another available wrecker service only 12 miles from the scene into another parish to the defendants' truck stop which was 25 miles distant.